IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYVANIA

| | |
|---|---|
| BRUNILDA LATE F/K/A | : |
| BRUNILDA PRIFTI, | : |
|     Plaintiff | : DOCKET NO.: |
| | : |
|       vs. | : CIVIL ACTION LAW |
| | : |
| GEISINGER d/b/a GEISINGER | : |
| HOLY SPIRIT HOSPITAL, | : JURY TRIAL DEMANDED |
|     Defendant | : |

## COMPLAINT

Now comes Plaintiff, Brunilda Late f/k/a Brunilda Prifti, by and through her counsel, Peggy M. Morcom, Esquire and Morcom Law, LCC and files this Complaint of ethnic discrimination, harassment, and retaliation pursuant to Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000(e), et seq. ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, et seq., and avers as follows:

## JURSIDICTION AND VENUE

1. Jurisdiction is appropriate in this Court under 28 U.S.C. §1331 and §1367.

2. Venue is proper because all parties reside or do business in this jurisdiction and all unlawful employment practices complained of occurred in this District.

3. On April 14, 2021, Plaintiff dual-filed a Complaint with the Pennsylvania Human Relations Commission and Equal Employment Opportunity Commission alleging discrimination, harassment, wrongful termination, and retaliation pursuant to Title VII, the PHRC, and the ADA. Plaintiff exhausted her administrative remedies. See Exhibit "A" attached hereto.

## PARTIES

4. Plaintiff incorporates paragraphs 1 through 3, as though fully set forth herein.

5. Brunilda Late, M.D., f/k/a Brunilda Prifti, M.D. ("Dr. Late") was an Attending Emergency Room Physician at Geisinger Medical Center d/b/a Geisinger Holy Spirit Hospital for the period 2018 through June 1, 2021.

6. Geisinger Holy Spirit Hospital ("Geisinger") is a Pennsylvania Corporation d/b/a Holy Spirit Hospital located at 503 N. 21st Street, Camp Hill, PA 17011.

7. At all times prior to November 2020, Holy Spirit Hospital was controlled, operated and within the healthcare network of Geisinger.

8. Geisinger's principal place of business is 100 North Academy Avenue, Danville, PA 17822.

## COUNT I
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT
## ETHNIC DISCRIMINATION AND HARASSMENT

9. Plaintiff incorporates paragraphs 1 through 8 as thought fully set forth herein.

10. At all relevant times, Geisinger employed in excess of 500 employees, and is an "employer" under Title VII of the Civil Rights Act.

11. At all relevant times, Dr. Late was an "employee" under Title VII of the Civil Rights Act.

12. James M. Leaming, M.D. ("Dr. Leaming"), American, was the Director of Emergency Medicine at Geisinger's Camp Hill location.

13. Dr. Late's nationality is Albanian. Dr. Late is a naturalized United States citizen.

14. Dr. Late was hired by Geisinger in 2018 upon completion of her Medical Residency.

15. In or about December 2019, Dr. Late raised concerns with Dr. Leaming and Susan Bolick Bonin (American), Physician Assistant and Nurse Practitioner Supervisor ("Bonin") that a Physician Assistant, Ellen Broz ("Broz"), American, was not completing the responsibilities associated with her position, specifically particular patient charting. Bonin responded, "she is risking her life daily to serve our country." Dr. Late responded, "I am a U.S. citizen. Don't put guilt on me." Dr.

Leaming stated, "You need to give her some TLC, she is like your child." Dr. Late advised that the Physician Assistant is thirty (30) years old, she not a child and she is expected to act professionally.

16. Dr. Leaming claimed Broz was serving in the Pennsylvania National Guard, when she was on vacation in Florida.

17. On April 27, 2020, Dr. Late received a telephone call from Dr. Leaming indicating he heard "you can't handle the ER." She advised that that statement was untrue, but that it was difficult to work with only one (1) physician on a shift for a Level II Trauma facility.  Dr. Late raised concerns to Dr. Leaming regarding patient safety.

18. On April 27, 2020, Dr. Late was the only physician working in the Emergency Department from 4:00pm to 11:00pm. As a result, Dr. Late was responsible for twenty-six (26) beds of patients.

19. One physician for 26 beds created an unsafe environment for patients, physicians, and staff. During all relevant times, the daylight shift of the Emergency Department was staffed with three (3) physicians.

20. The COVID-19 Pandemic began in or about March 2020.

21. During the pandemic, physicians were required to wear PPE which extended time and procedures.

22. On April 28, 2020, Dr. Leaming presented at the Emergency Department at 5:00pm unannounced. Dr. Late and Dr. Nicholas Julius (American) ("Dr. Julius") were working the day shift.   Upon arrival, Dr. Leaming released Dr. Julius from his responsibilities at approximately 5:15pm, despite Triage and the Emergency Department at full capacity.  Approximately two (2) hours into the shift, Dr. Leaming stated to Dr. Julius, "You're still here? Thank you for staying late." Dr. Late regularly stayed late, and she never received a "thank you" from Dr. Leaming.

23. Throughout the evening of April 28, 2020, Dr. Leaming exhibited agitated behaviors towards Dr. Late, including Dr. Leaming's refusal to communicate with Dr. Late and his refusal to acknowledge the work she was performing, which created a very uncomfortable work environment for Dr. Late.

24.  In the morning of April 28, 2020, Dr. Leaming intentionally asked Hristo Hristozov, Nurse Practitioner if Dr. Late did a "good job" that evening.  Mr. Hristozov is a subordinate to Dr. Late.

25. In June of 2020, Dr. Leaming intentionally failed to follow the job posting protocol by failing to officially post vacant positions.  Dr. Leaming proceeded to promote three (3) Attending Emergency Room Physicians without posting the positions.  Dr. Daggubatti was promoted to Assistant Medical Director. Dr. Abner and Dr. Julius were promoted to Physician Student Educator, when no

Physician Assistant or Nurse Practitioners students existed.  These promotions resulted in multiple days off per month.  All physicians identified were outside of Dr. Late's protected class.

26. Two physicians were promoted to Student Educator, despite no students to educate in the Emergency Department.

27. As a result of Dr. Leaming's actions, Dr. Late was not provided the opportunity to apply for positions for which she was qualified.

28. It is believed that Dr. Leaming intentionally failed to post the positions to excluded Dr. Late from being a candidate.

29. On July 1, 2020, Dr. Late complained of discrimination to Ms. Hollenbach ("Hollenbach"), Human Resources, that individuals in the Emergency Department were mimicking her accent and making fun of her accent, as an Albanian.

30. On July 14, 2020, Dr. Late had her evaluation with Dr. Leaming, and Hollenbach was present. Dr. Leaming accused Dr. Late of being rude to her co-workers and "scaring them" and that she "threatened them."

31. Dr. Leaming told Dr. Late that she was "mean and rude to Ellen Broz," in December 2019, while she was "on active duty serving our country." Dr. Leaming again stated, "She places herself in the front line (referring to the

employee's military service) for this country," insinuating Dr. Late did not care about the United States for which she is a citizen because she was Albanian.

32. Ms. Hollenbach advised Dr. Late that her "complaints of discrimination in the Emergency Department would ruin Dr. Leaming's career."

33. Dr. Leaming stated Dr. Late's voice was "disruptive, loud, and disrespectful." Dr. Late explained, on several occasions, that her Albanian accent is something that she cannot change, but she is never mean to her colleagues or other team members.

34. During the meeting, Dr. Late stated other physicians, surgeons and physician assistants, who are not Albanian, have yelled at others, including Dr. Leaming. No action was taken against them.

35. Dr. Late also complained to Dr. Leaming and Hollenbach there have been multiple occasions when Dr. Late was treated rudely by consultants.

36. On July 22, 2020, Hollenbach emailed Dr. Late and recommended a meeting with Dr. Ronald Strony, Rebecca Miller, Human Resources Supervisor, and Arthur Breese ("Breese"), Diversity Director, all American, to discuss her concerns.

37. On July 25, 2020, Bonin reported for her shift, acknowledged Dr. Daggubati (Indian/American) and Dr. Strine, (American), but intentionally ignored Dr. Late.

38. From 7:00pm to 10:00pm, Bonin examined five (5) patients and presented all of the patients to Dr. Daggubati and Dr. Strine.

39. At approximately 10:15pm, Dr. Late asked Dr. Daggubati why Bonin did not present any patients to her that evening. Dr. Daggubati ignored Dr. Late.

40. Dr. Daggubati took her bag as she was leaving the Department and signaled to Bonin to follow her. Dr. Late observed them in the hallway laughing.

41. Dr. Late believes the actions of Bonin and Dr. Daggubati were intentional and planned to exclude Dr. Late from providing patient care. Both individuals are friends with Dr. Leaming.

42. On July 31, 2020, Dr. Late again contacted Hollenbach to determine the status of the investigation surrounding the complaints. Hollenbach indicated that a meeting with Breese was being scheduled.

43. On August 6, 2020, Breese and Dr. Late spoke by telephone regarding her complaints. Hollenbach was present. Breese indicated he did not find any evidence of discrimination in the Emergency Department.

44. Several individuals with information supporting Dr. Late's complaint were never contacted to be interviewed. Dr. Late does not believe the investigation was properly completed.

45. During the August 6, 2020 telephone conference with Breese, Dr. Late was informed that a complaint against her was filed with Human Resources a few days prior (end of July).

46. Dr. Late believes the complaint was by an individual who was interviewed as part of her discrimination complaint and supported Dr. Leaming.

47. Dr. Late believes the complaint was intentional harassment and retaliation for her complaint against Dr. Leaming.

48. On September 24, 2020, Dr. Late received a command call regarding a 19-year-old male that was arriving by ambulance. She received the information. Hristozov saw the patient, who was stable, and Dr. Late evaluated the patient in Room 23. Hristozov presented the patient to Dr. Late. Approximately 5-10 minutes later, Dr. Julius questioned Hristozov, "why did you present that patient to her? I told you that you will present the patient to me." Hristozov looked shocked and stated, "I don't think you ever told me that."

49. Dr. Late believes Dr. Julius was intentionally interfering with her ability to perform her job responsibilities in the Emergency Department.

50. On September 26, 2020, Dr. Late emailed Hollenbach regarding the events of September, 24, 2020. Dr. Late again complained of discrimination and retaliation.

51. Dr. Late again stated she was being treated differently from other physicians. Dr. Late again explained the intentional behaviors of Dr. Julius, Dr. Joie Abner ("Dr. Abner"), and Dr. Daggubati.

52. On September 26, 2020, Hollenbach advised Dr. Late that multiple staff reported an alleged event from October 2019 wherein Dr. Late intentionally chose to sleep in a patient bed in a nursing pod while on duty. It was alleged that Amanda Reninger (American), Physician Assistant was working the Emergency Department and managed the caseload alone. The allegations were intentionally fabricated by individuals who were friends with Dr. Leaming, Dr. Daggubati, and Dr. Abner.

53. In October 2019, Dr. Late was underdoing cancer treatments, which caused her to experience a terrible migraine during her shift. Dr. Jose Serrano, who was working with Dr. Late, recommended that Dr. Late lay down in a bed for approximately 15 minutes. Dr. Late never slept.  Dr. Late did not take a patient bed. There were several beds available with no patients. At no time were patients unattended.

54. After Dr. Serrano departed around 3:00am, Dr. Late was alone working the Emergency Department from 5:00 am to 7:00 am, with Ms. Reninger, departing at 5:00 am. Dr. Late handled 15 patients, 3 of which were traumas.   Dr. Late departed at 9:30am, despite her shift ending at 8:00 am.

55. Dr. Late believes, as a result of her discrimination complaint, the events of October 2019 were brought to the attention of Human Resources in an attempt to place her in a bad light and distract from complaints.

56. During the shift of October 2019, the charge nurse, Dawn Retorick, contacted Dr. Leaming on multiple occasions to request assistant so Dr. Late could leave due to illness. Dr. Leaming intentionally did not answer his telephone or return her text messages.

57. Dr. Leaming repeatedly stated in meetings and emails that he should be contacted if a physician is ill, and he will cover the shift.

58. In October 2019, Dr. Leaming intentionally refused to relieve Dr. Late when she was ill and requested assistance.

59. On July 20, 2020, Dr. Late filed an internal complaint with Human Resources alleging ethnic discrimination and harassment by Dr. Leaming.

60. Dr. Late also filed a complaint with the Head of Diversity for Geisinger alleging ethic discrimination.

61. The physician assistants, Dr. Duggabati, and Dr. Abner were acting in concert and on behalf of Dr. Leaming to harass Dr. Late in the workplace. These individuals were intentionally and at the direction of Dr. Leaming: a) not presenting patients to Dr. Late; b) intentionally excluding Dr. Late from necessary

medical information concerning patient; and c) making false allegations regarding patient care and behaviors of Dr. Late.

62. The behaviors of subordinates continued and worsened after Dr. Late's complaints to Human Resources and the Head of Diversity in July 2020.

63. The actions of Defendant's employees against Dr. Late were regular and pervasive.

64. Defendant maintained policies related to discrimination, harassment, retaliation, and bullying behavior in the workplace, but failed to comply with and enforce the same as it relates to Dr. Late because of her ethnicity.

65. The actions of Defendants employees as described herein were a willful course of conduct, which continued and escalated after Dr. Late's complaints.

66. As a direct and proximate result of the described actions, Dr. Late suffered financial injury, including but not limited to future loss of earnings, loss of earning potential, loss of benefits, loss of retirement benefits.

67. As a direct and proximate result of the described actions, Dr. Late suffered from emotional and mental injuries, including, but not limited to, past and present pain and suffering, humiliation, and anxiety.  Dr. Late sought medical treatment during her employment, and she was placed on medication.

68. As a direct and proximate result of the described conduct, Dr. Late suffered professional injuries including, but not limited to, professional reputation, professional development and loss of potential promotions.

## COUNT II
## VIOLATIONS OF THE PENNSYLVANIA HUMAN RELATIONS ACT
## ETHNIC DISCRIMINATION AND HARASSMENT

69. Plaintiff incorporates paragraphs numbered 1 through 68, as though fully set forth herein.

70. Defendant is an "employer" as that term is defined under the PHRA.

71. The actions of Defendant as described herein were a willful course of conduct, which continued and escalated after Dr. Late's complaints.

72. As a direct and proximate result of the described actions, Dr. Late suffered financial injury, including but not limited to future loss of earnings, loss of earning potential, loss of benefits, loss of retirement benefits.

73. As a direct and proximate result of the above-described actions, Dr. Late suffered from emotional and mental injuries, including, but not limited to, past and present pain and suffering, humiliation, and anxiety.  Dr. Late sought medical treatment during her employment, and she was placed on medication.

74. As a direct and proximate result of the above-described conduct, Dr. Late suffered professional injuries including, but not limited to, professional reputation, professional development and loss of potential promotions.

## COUNT III
## RETALIATION

75. Plaintiff incorporates paragraphs numbered 1 through 74, as though fully set forth herein.

76. As a direct and proximate result of Dr. Late's multiple internal complaints, Dr. Leaming and his close personal work friends, along with Hollenbach acting on behalf of Respondent began a course of conduct in retaliation for Dr. Late's complaints.

77. In June of 2020, Dr. Leaming intentionally failed to post open position of promotion to eliminate Dr. Late as a candidate because of her ethnicity and complaints of discrimination and harassment against him.

78. At the beginning of the October 20, 2020 meeting, Hollenbach collected Dr. Late identification badge.  Dr. Late was advised that she was being suspended without pay for three (3) days, and she was not permitted to return to the Emergency Department. Dr. Late attempted to explain to Hollenbach and Dr. Strony that she was treating patients and care was not complete, and that she still had charting to finalize. Hollenbach yelled, "No!" at Dr. Late.   Dr. Late began to cry and became physically ill to the point that she thought she was going to vomit, and she was experiencing dry heaves. When Dr. Late started to move from her chair to a trash can, Hollenbach again yelled at Dr. Late, "STOP! You are not to

move!" She further stated that if Dr. Late left the area where she was standing that she would "call security and escort Dr. Late out of the hospital."

79. During October 20, 2020 meeting, Dr. Late was falsely accused of various performance issues or policy violations for which she was suspended.

80. Dr. Late firmly believes her disciplinary suspension in October 2020 was in retaliation for her numerous complaints of ethnic discrimination (Albanian) in the department, directed towards Dr. Late.

81. When Dr. Late inquired as to the status of her September 26, 2020, complaint, Hollenbach responded, "I conducted an investigation. I asked Hristo and he said that he was not interested in pursuing the complaint because Dr. Julius didn't do anything wrong." Hristo was never contacted by Human Resources regarding the complaint.

82. Hollenbach later stated Dr. Leaming finished the care of her patients on October 2020. Dr. Late believes and avers this statement to be untrue, as her patients were unattended for over one hour, and Dr. Owens advised Dr. Late that he receiving a telephone call at or about 4:00pm from Dr. Leaming to take over Dr. Late's patients.

83. Following the October 20, 2020 meeting, Hollenbach retrieved Dr. Late's personal bag from the Emergency Department, since Dr. Late was not permitted to return to the Emergency Department.

84. On October 20, 2020 meeting, Dr. Daggubati and Bonin were discussing Dr. Late's suspension with other employees in the Emergency Department during their shift.

85. On October 24, 2020 Dr. Daggubati, Bonin and Broz were talking during the shift about Dr. Late's suspension, and their displeasure with the fact that Dr. Late was being paid while on suspension. Dr. Daggubati stated, "it is not what we intended to do."

86. It is believed that Hollenbach and Dr. Leaming shared confidential personnel information concerning Dr. Late with other employees in the Emergency Department on October 20, 2020.

87. Dr. Late made repeated complaints to Human Resources regarding discrimination and harassment by Dr. Leaming and other individuals within the Emergency Department. Human Resources failed to fully investigate Dr. Late's complaints and take appropriate action to stop the behavior.

88. Dr. Late did not violate Defendant's policies by discussing her concerns related to discrimination and retaliation in the workplace.

89. During the October 20, 2020, meeting, Hollenbach advised Dr. Late that she was "required to seek treatment" through the Employee Assistance Program because she suffered from anxiety and heart palpitations brought on by the

behaviors of Dr. Leaming and those he intentionally directed to act against Dr.
Late.

90. Hollenbach also referred Dr. Late to ComPsych for evaluation and
treatment. Dr. Late believes this referral was intended as continued harassment and
in retaliation for her complaints of discrimination.

91. On October 23, 2020, Hollenbach advised Dr. Late that her three (3) day
unpaid suspension would be paid suspension.

92. In December 2020, all Attending Physicians in the Emergency
Department began receiving preliminary contracts for continued employment with
the new entity governing the hospital. Dr. Late believes and avers that no contract
was issued to her because of statements made by Dr. Leaming and Hollenbach in
retaliation for her complaints of discrimination and harassment.

93. In early March 2021 during the mandatory monthly in-person meetings,
the topic of discussion was the new Attending Physician Contracts. Dr. Late was
required to attend the meeting. It was during this meeting that Dr. Late became
aware that the final contracts were provided to all Attending Physicians, except Dr.
Late. The contracts were effective July 1, 2022. Dr. Late emailed Dr. Leaming
to advise that she still did not receive her contract, and no response was received
from Dr. Leaming.

94. On March 24, 2021, Dr. Late contacted Dr. Dalone regarding the status of her contract.  Again, Dr. Late did not receive a response.

95. On February 5, 2021, Dr. Late became aware that Dr. Julius was aware of her complaints against him, and he stated, "I saw your emails that you sent to Human Resources complaining about me.  I can't believe that you will do that to me.  I read everything."

96. On March 3, 2021, Dr. Late was again instructed by Dr. Leaming to complete patient charts Broz, who was out on leave.  Dr. Late advised Dr. Leaming and the billing department that she did not examine the patients, and the patients were only presented to her by Broz.  Dr. Late believed (as before) that such action is a falsification of patient records and fraud.  Dr. Late completed the charting by copying from the admitting physician's notes, and this was explained to Dr. Leaming.

97. On May 13, 2021, Dr. Late sent a letter of resignation to Dr. Leaming, providing a one-month notice of her departure from Geisinger.

98. On May 31, 2021, Dr. Late was informed by Dr. Daggubati that there would be a meeting conducted the next day via Zoom and reminded Dr. Late, "Don't forget about the Zoom meeting tomorrow at 2:00p.m."

99. On June 1, 2021, Dr. Late attempted to log into her work email and was denied access. Dr. Late was also denied access to all systems she regularly used to

perform her job responsibilities. Dr. Late subsequently sent a message through Tiger Connect and an email to everyone that she was scheduled to have the meeting with at 2:00p.m. informing them of her technical issues. Dr. Leaming and Sarah Taylor ("Taylor"), Human Resources Representative, responded to the message through Tiger Connect asking Dr. Late, "When is the best time to talk?" Because Dr. Late had been locked out of all employment systems, she was unable to attend the meeting.

100. Following the message to Dr. Late, a Tiger Text was sent from Dr. Leaming to all Emergency Department providers, excluding Dr. Late, informing them that an emergency meeting of the Emergency Department physicians at 4:00p.m. that day.

101. During the meeting at 4:00p.m., Dr. Leaming asked the physicians if they could take Dr. Late's shifts since she was leaving Geisinger. Despite Dr. Late being given no notice that her shifts were going to be taken from her and that Dr. Late had no intention dividing her scheduled shifts amongst her colleagues, her scheduled shifts were taken from her and divided amongst the other Emergency Department physicians.

102. Upon the removal of Dr. Late from the schedule, it was Dr. Leaming's intent to cease payment to Dr. Late immediately.

103. On June 9, 2021, Dr. Late had a meeting via Zoom with Taylor, who indicated that Dr. Late could choose to return to the Emergency Department and take back her previously scheduled shifts or she could remain at home and be paid. As Dr. Late's shifts had already been taken from her, she chose to finish the duration of her employment at home.

104. The actions of Defendant were a willful course of conduct, which continued and escalated after Dr. Late's complaints as set forth above.

105. As a direct and proximate result of the described actions, Dr. Late suffered financial injury, including but not limited to future loss of earnings, loss of earning potential, loss of benefits, loss of retirement benefits.

106. As a direct and proximate result of the described actions, Dr. Late suffered from emotional and mental injuries, including, but not limited to, past and present pain and suffering, humiliation, and anxiety.  Dr. Late sought medical treatment during her employment, and she was placed on medication.

107. As a direct and proximate result of the above-described conduct, Dr. Late suffered professional injuries including, but not limited to, professional reputation, professional development and loss of potential promotions.

**<u>REQUESTED RELIEF</u>**

WHEREFORE, Plaintiff, Brunilda Late, respectfully requests this Honorable Court to enter Judgment in her favor and against Defendant for damages in an

amount in excess of $75,000.00, plus interests and costs of suit as well as the following:

(a)   Exercise jurisdiction over this matter;

(b)   Order Defendant to reimburse Plaintiff for all salary and benefits lost by her as a result of Defendant's actions, in an amount in excess of $75,000.00, including but not limited to front pay, back pay, and compensatory damages;

(c)   Award Plaintiff punitive damages;

(d)   Award Plaintiff all costs of this action, including reasonable attorney's fees;

(e)   Grant Plaintiff such other and further relief as this court deems just proper and equitable.

Respectfully submitted,

/s/Peggy M. Morcom
Peggy M. Morcom, Esquire
Atty. ID No.: 92463
Morcom Law, LLC
226 W. Chocolate Avenue
Hershey, PA 17033
Phone: (717) 298-1907
Fax: (717) 298-3232
pmorcom@morcomlaw.com
Counsel for Plaintiff

Date: 12/1/22